OPINION OF THE COURT
Shirley Werner Kornreich, J.
Motion sequence Nos. 001, 002, and 003 are consolidated for disposition.
Defendants Reich & Tang Deposit Solutions, LLC (RTDS), Reich & Tang Asset Management, LLC (RTAM) (collectively, Reich & Tang) and Michael Lydon move, pursuant to CPLR 3211, and as limited by the parties’ briefs and stipulations, to dismiss the fraud claim pleaded in the complaint. (Sequence No. 001.1[1] Plaintiffs Island Intellectual Property LLC and Double Rock Corporation oppose the motion to dismiss and *197 cross-move, pursuant to CPLR 3211 (c), for partial summary judgment on their breach of contract and indemnification claims. Defendants also move, pursuant to CPLR 2201, to stay this action pending final adjudication of related, subsequently filed actions in Delaware Federal District Court. (Sequence No. 002.) Plaintiffs oppose a stay. Finally, plaintiffs move, pursuant to CPLR 2701 (1), (1) to compel defendants to deposit royalty payments into court; and (2) for an accounting. (Sequence No. 003.) Defendants oppose this motion. For the reasons that follow, plaintiffs’ cross motion for partial summary judgment and motion to compel an accounting are granted, and the remainder of the parties’ motions are denied.
I. Factual Background and Procedural History
The facts relevant to this decision are drawn from the complaint (see Doc No. 8) and the documentary evidence submitted by the parties.
This case concerns the sale of plaintiffs’ business to defendants. A small percentage of the purchase price was paid, with the balance to be paid over time as an “earn-out” in the form of royalty payments under a patent license. It is undisputed that defendants refuse to pay plaintiffs the full amount of the earn-out. Their proffered excuse is the supposed invalidity of the business’ patents. However, defendants do not dispute that, under the governing contracts discussed herein, payments may not be withheld unless and until all patents are declared invalid. That has not occurred.[2] Nonetheless, relying on their belief that all of the patents will eventually be declared invalid under Alice Corp. Pty. Ltd. v CLS Bank Int’l (573 US —, 134 S Ct 2347 [2014]), defendants argue that their federal right under the Lear doctrine to withhold royalty payments for invalid patents preempts the contracts’ provision to the contrary. (See Lear, Inc. v Adkins, 395 US 653 [1969].)[3] Defendants contend that they need not pay royalties until their patent invalidity *198 claims are adjudicated in federal court in Delaware and, therefore, seek a stay of this action until the Delaware proceedings conclude. The court disagrees with defendants’ position. Accordingly, dismissal and a stay are denied and partial summary judgment is granted to plaintiffs. However, plaintiffs’ request for what is effectively judgment enforcement relief is denied.
The complaint alleges:
“Reich & Tang is an investment management firm that provides deposit, liquidity, and cash management services to banks, broker-dealers, investment advisors, institutional investors, and public entities. Prior to the transaction at issue, Reich & Tang’s cash management business principally involved money market funds, which are short-term mutual funds that invest in government securities, certificates of deposit, asset-backed commercial paper, and other liquid securities. Between 2007 and 2009, Reich & Tang’s cash management business became very challenging due to (i) very low money market rates, which were brought on by Federal Reserve policies instituted in response to the deepening financial crisis, and (ii) restrictive new parameters proposed by regulators for money *199 market funds. In order for Reich & Tang to remain viable, it needed to refocus its cash management business on FDIC-insured cash management products, which tend to be more profitable and less influenced by money market rates. In 2009, Reich & Tang expressed an interest in purchasing Double Rock’s FDIC-insured cash management business (operated through multiple Double Rock subsidiaries including LIDs Capital LLC), which was very valuable with approximately $12 billion in assets at the time. As Double Rock initially was not then interested in selling its cash management business, Reich & Tang elected to become a private label client, meaning Double Rock would manage Reich & Tang’s investment assets under the Reich & Tang brand. Pursuant to this private label client relationship with Double Rock, [RTDS] entered into an Insured Deposit Agreement with Double Rock’s subsidiary, LIDs Capital LLC, on October 8, 2009. The same day, as part of the same transaction, [RTDS] entered into a License Agreement with [Island], pursuant to which [Island] granted [RTDS] a non-exclusive license to use [Island] FDIC-insured related patents.” (Complaint ¶¶ 11-16 [emphasis added; paragraph breaks and numbering omitted].)[4]
After a year of operating as a licensee, "Reich & Tang offered to acquire from Double Rock its entire FDIC-insured cash management business, including its $12 billion of assets under management.” (Complaint ¶ 19.) The parties agreed that $15 million would be paid and the balance of the purchase price would follow in the form of earn-out payments made pursuant to “an ancillary license agreement with [Island], Double Rock’s intellectual property affiliate.” (Complaint ¶ 20.) The license payments constituted the bulk of the consideration for the sale of Double Rock’s FDIC-insured cash management business. Double Rock alleges that since
“the value of its business far exceeded the $15 million upfront payment, Double Rock never would have agreed to sell for an upfront cash payment equal to only a fraction of that business’ true value, *200 had the purchaser, Reich & Tang, not also agreed to enter into an ancillary license agreement conveying payments equal to the balance of that business’ value. In this case, Double Rock projected that the Amended License Agreement would yield approximately $92 million in royalty payments over the course of the license.” (Complaint ¶ 22.)
The contracts governing the transaction are: (1) an asset purchase agreement (APA) dated as of December 22, 2010, controlling Reich & Tang’s acquisition of the business (as defined in the APA) from Double Rock (see Doc No. 13); and (2) a license agreement between Island and RTDS, the operative version being the amended and restated license agreement (ALA), dated January 3, 2011,[5] controlling the payments RTDS must make to Island for use of the 52 licensed patents (the licensed patents) listed on exhibit A thereto.[6] (See Doc No. 14 [the ALA] at 25.) Both contracts are governed by New York law.
The APA defines acquired assets to mean:
“the following assets of the Seller Parties [defined to include Double Rock] used, or held for use, in connection with the Business [defined to include Double Rock FDIC-insured businesses], and only the following assets: (i) all of the Seller Parties’ rights, privileges and powers with respect to the Business for the Customer Deposits, (ii) all goodwill of the Business, (iii) Customer lists and other similar property rights used principally in connection with the conduct of the Business (including the right to represent to third parties that Buyer is the successor to the Business), to the extent used in the Business (it being agreed and understood that to the extent used in the Business and other businesses of Double Rock Corporation, only copies of the same will be included within the Acquired Assets), (iv) all Contract rights of the Seller Parties with respect to the Business under each Transferred Contract, including rights to receive fee *201 income, revenues and other payments and reimbursements payable in respect of the operation of the Business after the Closing Date (and only in respect of the operation of the Business after the Closing Date), (v) the Books and Records, (vi) any rights of the Seller Parties with respect to goods and services to be provided in connection with the Business on or after the Transitional Services Termination Date that have been prepaid by the Seller Parties (other than insurance policies, which shall not constitute Acquired Assets), whether or not such rights exist as of the Closing Date (the ‘Prepaid Expenses’), (vii) all trademarks, service-marks, uniform resource locators, domain names and toll-free telephone numbers used in the operation of the Business to the extent set forth on Schedule 1.1(c), (viii) all business methods and know how related exclusively to the operation of the Business, (ix) all restrictive covenants in the Seller Parties’ favor relating to the Business, (x) claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment to the extent relating to any right, property or asset included in clauses (i) through (ix) above relating to the Business on or after the Closing Date (but excluding Tax refunds or other rights with respect to Retained Liabilities), or against any party to a Transferred Contract to the extent relating to the subject matter of such Transferred Contract for actions relating to such Transferred Contract on or after the Closing Date and (xi) 100% of the outstanding limited liability company interests of Stable and Stable II; provided, however, that, for the avoidance of doubt, the Acquired Assets shall not include any of the Licensed Intellectual Property or any of the Excluded Assets.” (See Doc No. 13 at 11 [emphasis added].)
In other words, the entire business, and virtually all of its attendant rights and assets, were sold. Pursuant to section 2.4, the consideration paid at closing was the $15 million closing payment. (See id. at 19.)[7]
The APA defines ancillary agreements to include the ALA. (See id. at 12.) The “rights of the Seller Parties under [the *202 APA] and the Ancillary Agreements” are included in the definition of excluded assets, i.e., they are not acquired assets. (Id. at 14; see id. at 34 [“Following the Closing Date, the Seller Parties shall have no control over, or participation in, the operations of the Business except to the extent provided in (the APA) or the Ancillary Agreements”].) The ALA was entered into in conjunction with the APA as an integrated transaction. (See id. at 40 [“Simultaneous with Closing, each Seller Party, if a party to the applicable Ancillary Agreements, and Buyer shall have entered into the Ancillary Agreements”].) It provides that RTAM may be held liable for RTDS’s breach of the ALA. Section 7.2 (b) of the APA states:
“From and after the Closing Date, and subject to this Article VII, each of the Buyer Parties agrees to indemnify and hold harmless the Seller Parties and their Affiliates and their respective successors, assigns, directors, members, partners, officers, employees and agents (‘Seller Indemnified Persons’) against and in respect of any and all Losses resulting from, arising out of, in connection with or otherwise relating to . . . (ii) any non-fulfillment of, or failure to comply with, or breach of any covenant or agreement made by any Buyer Party or Natixis in this Agreement or in any Ancillary Agreement.” (See Doc No. 13 at 42 [emphasis added].)
Thus, RTAM may be held liable for RTDS’s failure to make the royalty payments due under the ALA.
Section 2.1 of the ALA defines the scope of the license:
“In consideration for the payments set forth herein and other good and valuable consideration, Licen-sor [Island] hereby grants as of the Effective Date [Jan. 3, 2011], and Licensee [RTDS] hereby accepts,
(a) a non-exclusive, worldwide, right and license under and to the Licensed Patents, and (b) a non-exclusive, worldwide, right and license under and to the Business Know-how, in each case to practice any and all methods claimed or disclosed therein, and to make, have made, use, distribute, lease, sell, offer for sale, import, export, develop and otherwise dispose of and exploit any and all *203 products and services within the Business Field (‘License’).” (See Doc No. 14 at 6 [emphasis added].)
Business know-how is defined to mean “Know-how owned or Controlled by Licensor, Parent and/or their respective Affiliates as of the Effective Date that Licensor, Parent and/or their respective Affiliates use in connection with, or is otherwise useful to, in the Business Field, as provided to Licensee pursuant to the [APA].” (See Doc No. 14 at 3.) Know-how, critically, is defined to mean
“any and all technical, scientific, trade, quality assurance, quality control, financial and business information, know-how, trade secrets, materials, Software and other Intellectual Property (other than Patent Rights), including without limitation all methods, protocol, results, analyses, conclusions and other information, data, discoveries, inventions, improvements, processes, regulatory documentation, information and submissions and formulae, whether patentable or unpatentable.” (See id. at 4 [emphasis added].)
The royalty payments due under the ALA are set forth in section 3.1, and include payment, on a quarterly basis, of 15% of RTDS’s gross revenue on certain of its lines of business (or a greater amount dependent on another formula).[8] Suffice it to say that the amount of royalty payments is dependent on the success of the business defendants purchased from plaintiffs. The royalty payments effectively function as an earn-out—a typical feature of an asset purchase agreement where the purchase price correlates to the company’s post-sale performance.[9]
*204 Section 6.1 of the ALA provides:
“The term of this Agreement shall commence on the Effective Date and, unless terminated in accordance with the provisions of this Article VI, shall, continue indefinitely, provided that it is understood that the License granted hereunder relating to the Licensed Patents shall expire on the date of the last to expire of the Licensed Patents. For the avoidance of doubt, Licensee shall have no obligation of payment to Licensor hereunder upon and in the event all of the Licensed Patents expire, are abandoned, nullified or become subject to a final, unappealable Order invalidating all such Licensed Patents.” (See Doc No. 14 at 14 [emphasis added].)[10]
It is undisputed that, to date, all of the licensed patents have not been “abandoned, nullified or become subject to a final, unappealable Order invalidating all such Licensed Patents.” Nonetheless, defendants have stopped paying all royalty payments due under section 3.1. Further, defendants have commenced actions in which they seek to invalidate the licensed patents, despite section 6.4, which states that “[d]uring the Term of this Agreement, Licensee agrees not to challenge or assist others in challenging the validity and/or enforceability of the Licensed Patents before any Governmental Authority.” (See id. at 15.)
On May 18, 2015, plaintiffs commenced this action by filing a summons with notice. On June 23, 2015, plaintiffs filed a complaint, asserting three causes of action: (1) breach of the ALA for failure to make royalty payments, asserted against RTDS; (2) indemnification under section 7.2 (b), asserted against RTAM, for the royalty payments not made by RTDS;[11] and (3) fraudulent inducement of Double Rock’s sale of its business, asserted against all defendants.[12]
The fraudulent inducement claim is based on the following allegations:
“Defendants induced [plaintiffs] to enter into the [APA] by representing that they ‘would enter into, *205 and make timely and complete royalty payments under, an ancillary license agreement with [Island] if Double Rock agreed to sell its cash management business to Reich & Tang for an upfront cash payment of $15 million, an amount which represented only a fraction of the true value of that business.’ Compl. ¶ 85. Mr. Lydon ‘personally assured the Vice Chairman of Double Rock, Bruce Bent II, on multiple occasions that Reich & Tang had committed to honor those royalty terms.’ Id. ¶ 24; Bent Aff. Ex. A (Oct. 20, 2010 Letter); see also Compl. ¶ 85. These representations were material; Double Rock would never have accepted Reich & Tang’s purchase offer if it knew Reich & Tang never intended to honor its obligations under the [ALA].” (See Doc No. 33 at 28.)
In short, plaintiffs allege they were defrauded into selling their business, which managed billions of dollars, for a fraction of its value, based on a false promise to pay the royalties due under the ALA, which royalties were to reimburse plaintiffs for the real value of their business. According to plaintiffs, defendants never intended to make the royalty payments and almost immediately ceased making them based on the claimed invalidity of the licensed patents under Alice and the Lear doctrine. Simply put, plaintiffs claim that had they known that defendants had no intention of abiding by the specific terms of the ALA, they would not have sold their business without requiring far more than $15 million paid up front.
Defendants filed the instant motion to dismiss on August 13, 2015. The scope of that motion is now limited to the question of whether plaintiffs have stated a claim for fraud. On September 14, 2015, plaintiffs cross-moved for partial summary judgment on their claims for nonpayment of royalties against RTDS and indemnification for such breach against RTAM (as noted at the outset, the portion of the cross motion regarding payment into escrow was resolved). The court reserved on the motion and cross motion after oral argument. (See Doc No. 93 [Mar. 8, 2016 tr].)
The motion and cross motion were then held in abeyance pending the parties’ extensive mediation efforts, which appear to have stalled in January 2017. (See Doc Nos. 92, 94.) In the interim, on November 23, 2016, defendants filed seven declaratory judgment actions in Delaware Federal District Court (each styled Reich & Tang Deposit Solutions, LLC v Island Intel *206 lectual Property LLC) seeking to invalidate the licensed patents. (See Doc Nos. 61-67.) That same day, defendants filed a motion to stay this action pending final adjudication of the Delaware actions, which plaintiffs oppose.
While all of these motions were sub judice, on February 16, 2017, plaintiffs moved to compel defendants (1) “to deposit Plaintiffs’ overdue royalty payments with the Court, as well as future royalty payments as they become due under the [ALA], until the resolution of this lawsuit”; and (2) to compel an accounting of royalties. (See Doc No. 95.)[13] Defendants oppose this motion, which was taken on submission on the papers.
Most recently, the parties notified the court of a June 8, 2017 hearing in the Delaware actions. (See Doc No. 141 [June 8, 2017 tr].) At the conclusion of that hearing, the Federal Court (Sleet, J.) issued orders staying the Delaware actions pending this court’s decision on the instant motions and requested a status update from the parties within 30 days of such decision. (See Doc No. 139.) The parties then filed unsolicited letters regarding the scope of the issues before this court, which the court will not address since such scope should be evident from this decision.
II. Legal Standard
On a motion to dismiss, the court must accept as true the facts alleged in the complaint as well as all reasonable inferences that may be gleaned from those facts. (Amaro v Gani Realty Corp., 60 AD3d 491 [1st Dept 2009]; Skillgames, LLC v Brody, 1 AD3d 247, 250 [1st Dept 2003], citing McGill v Parker, 179 AD2d 98, 105 [1st Dept 1992]; see also Cron v Hargro Fabrics, 91 NY2d 362, 366 [1998].) The court is not permitted to assess the merits of the complaint or any of its factual allegations, but may only determine if, assuming the truth of the facts alleged and the inferences that can be drawn from them, the complaint states the elements of a legally cognizable cause of action. (Skillgames, 1 AD3d at 250, citing Guggenheimer v *207 Ginzburg, 43 NY2d 268, 275 [1977].) Deficiencies in the complaint may be remedied by affidavits submitted by the plaintiff. (Amaro, 60 AD3d at 492.) “However, factual allegations that do not state a viable cause of action, that consist of bare legal conclusions, or that are inherently incredible or clearly contradicted by documentary evidence are not entitled to such consideration.” (Skillgames, 1 AD3d at 250, citing Caniglia v Chicago Tribune-N.Y. News Syndicate, 204 AD2d 233 [1st Dept 1994].) Further, where the defendant seeks to dismiss the complaint based upon documentary evidence, the motion will succeed if “the documentary evidence utterly refutes plaintiff’s factual allegations, conclusively establishing a defense as a matter of law.” (Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 326 [2002] [citation omitted]; Leon v Martinez, 84 NY2d 83, 88 [1994].)
On the other hand, summary judgment may be granted only when it is clear that no triable issue of fact exists. (Alvarez v Prospect Hosp., 68 NY2d 320, 325 [1986].) The burden is upon the moving party to make a prima facie showing of entitlement to summary judgment as a matter of law. (Zuckerman v City of New York, 49 NY2d 557, 562 [1980]; Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1067 [1979].) A failure to make such a prima facie showing requires a denial of the motion, regardless of the sufficiency of the opposing papers. (Ayotte v Gervasio, 81 NY2d 1062, 1063 [1993].) If a prima facie showing has been made, the burden shifts to the opposing party to produce evidence sufficient to establish the existence of material issues of fact. (Alvarez, 68 NY2d at 324; Zuckerman, 49 NY2d at 562.) The papers submitted in support of and in opposition to a summary judgment motion are examined in the light most favorable to the party opposing the motion. (Martin v Briggs, 235 AD2d 192, 196 [1st Dept 1997].) Mere conclusions, unsubstantiated allegations, or expressions of hope are insufficient to defeat a summary judgment motion. (Zuckerman, 49 NY2d at 562.) Upon the completion of the court’s examination of all the documents submitted in connection with a summary judgment motion, the motion must be denied if there is any doubt as to the existence of a triable issue of fact. (Rotuba Extruders v Ceppos, 46 NY2d 223, 231 [1978].)
III. Discussion
As an initial matter, the court will not opine on whether any of the licensed patents might be held invalid under Alice (573 US —, 134 S Ct 2347 [2014]). Those issues will be adjudicated *208 in the Delaware federal actions.[14] Nonetheless, this court does not lack jurisdiction over claims for breach of contract, whether an earn-out or patent license agreement. As this court recently noted:
“It is well settled that ‘actions involving contracts relating to patents . . . are not considered suits arising under [patent] laws, and are properly brought in the State court, even if the validity of the patent may somehow be involved and the plaintiff could have brought suit for its infringement in the Federal court.' American Harley Corp. v Irvin Indus., 27 NY2d 168, 172 (1970) (emphasis added). ‘In other words, the fact that the foundation for suit is a contract granting patent rights and that the plaintiff must rely on the patent in support of his cause of action is not determinative and neither vests the Federal court with jurisdiction nor deprives the State court of power to entertain the action.’ Id.” (Bioenergy Life Science, Inc. v Ribocor, Inc., 2015 NY Slip Op 30166[U], *5-6 [Sup Ct, NY County 2015]; see NeuroRepair, Inc. v The Nath Law Group, 781 F3d 1340, 1344 [Fed Cir 2015] [explaining test to determine when “a cause of action created by state law may nevertheless ‘arise under’ federal patent law within the meaning of 28 USC § 1338(a)”].)
Indeed, the parties have not taken the position that this court lacks subject matter jurisdiction over this case or their disputes regarding the applicability of the Lear doctrine.
The Federal Circuit[15] has explained that “Lear abrogated the doctrine of ‘licensee estoppel’ principles developed under state law, and also precluded the award of royalties to the licensor under the facts of that case [where the license issued prior to the patent] from the date the patent issued if the patent were *209 later held invalid.” (RCA Corp. v Data Gen. Corp., 887 F2d 1056, 1064 [Fed Cir 1989].)[16] Critically, however, “Lear does not in fact discuss a licensor’s right to royalties where a license agreement was entered after a patent issued.” (Id.) This question “continue[s] to be [a matter] dependent on particular fact situations, contract provisions and state contract law, albeit [to] be resolved in harmony with general principles discernible from Lear.” (Id.)
The limited scope of Lear has been addressed by numerous courts since it was issued in 1969. (See e.g. Dow Chem. Co. v United States, 226 F3d 1334, 1344 n 11 [Fed Cir 2000] [“The Court of Federal Claims noted that Lear does allow a licensee to cease payments due under a license while challenging the validity of a patent, but that it does not permit the licensee to avoid the consequences that such actions would bring”], citing Cordis Corp. v Medtronic, Inc., 780 F2d 991, 995 [Fed Cir 1985].) The Federal Circuit in Cordis endorsed the Second Circuit’s explanation of Lear in Warner-Jenkinson Co. v Allied Chem. Corp. (567 F2d 184 [2d Cir 1977]):
“We believe that if the plaintiffs wish to continue to invoke the protections of their licensing agreements, they should be required to continue paying their royalties to the defendant. Ultimately, all royalties paid after the filing of the complaint may have to be returned to the plaintiffs. ... At present, plaintiffs already have the option of withholding royalties and thereby breaching the licensing agreement; of course, they would then run the risk of an injunction if they should lose on the merits. It would not be fair for the plaintiffs to be allowed simultaneously to reap all the benefits of the licensing agreement and to deprive the licensor of all his royalties. Patents are presumed to be valid, 35 U.S.C. §282; until invalidity is proven, the patentee should ordinarily be permitted to enjoy the fruits of his invention. The principal effect of an escrow arrangement would be to put undeserved pressure on the defendant.” (See Cordis, 780 F2d at 995 [emphasis added], quoting Warner-Jenkinson, 567 F2d at 188.)
With respect to no-challenge clauses, such as section 6.4 of the ALA, plaintiffs note that the Second Circuit opined in dicta *210 on their enforceability in Warner-Jenkinson (see 567 F2d at 188 [“(I)f a settlement agreement contains an explicit prohibition on licensee suits during some future period ... a court may feel that effect should be given to such provisions”]), and has since recognized that “the Federal Circuit has held that a no-challenge clause in [a settlement of a patent dispute] is valid under Lear.” (Rates Tech. Inc. v Speakeasy, Inc., 685 F3d 163, 170 [2d Cir 2012], citing Flex-Foot, 238 F3d at 1367-1370.)
This line of cases, however, is not controlling. Flex-Foot is not on point because it involved a settlement agreement. Flex-Foot held that
“[o]nce an accused infringer has challenged patent validity, has had an opportunity to conduct discovery on validity issues, and has elected to voluntarily dismiss the litigation with prejudice under a settlement agreement containing a clear and unambiguous undertaking not to challenge validity and/or enforceability of the patent in suit, the accused infringer is contractually estopped from raising any such challenge in any subsequent proceeding.” (Flex-Foot, 238 F3d at 1370.)
As more recently explained by the Federal Circuit:
“In Lear . . . , the Supreme Court eliminated the doctrine of licensee estoppel,’ citing the Important public interest in permitting full and free competition in the use of ideas.’ Under Lear, a licensee of a patent is not estopped from challenging the validity of the licensed patent by virtue of the license agreement. In subsequent cases, our court and our predecessor court have confronted the question of whether consent decrees and settlement agreements may at one and the same time provide for a patent license while barring challenges to patent invalidity and unenforceability. We have held that Lear does not render such agreements unenforceable, because of the strong policy in favor of settlement of litigation and, in the case of consent decrees, the policy in favor of res judicata.” (Baseload, Energy, Inc. v Roberts, 619 F3d 1357, 1361 [Fed Cir 2010] [citations omitted].)
These circumstances are not present in this case.
Rates Tech. is somewhat more relevant, as it addressed how to apply Lear to pre-litigation patent disputes. There, the *211 Second Circuit held “that covenants barring future challenges to a patent’s validity entered into prior to litigation are unenforceable, regardless of whether the agreements containing such covenants are styled as settlement agreements or simply as license agreements.” (See 685 F3d at 172.)
After weighing this authority, the court finds that this case is not sufficiently analogous to Flex-Foot, Rates Tech., or any of the cases cited by the parties, and, therefore, a clear justification to enforce section 6.4’s no-challenge clause does not exist.[17] Nevertheless, the court does not believe that the Lear doctrine bars plaintiffs’ claims. Unlike the cases cited by the parties, this case does not involve a stand-alone royalty agreement. It involves the sale of a business, where the bulk of the consideration was a percentage of the business’ future gross revenue due to be paid under the ALA. The amount of those payments is directly dependent on the performance of the company, not the value of the patents themselves. The ALA, in fact, consigns a broad array of rights, including nonpatentable, proprietary trade secrets. Hence, the fundamental concern of Lear—payment for worthless patents—is not implicated because the scope of the ALA is far broader than the mere use of the licensed patents, and the royalty payments due, as set forth in section 3.1, are, in effect, an earn-out based on the business’ gross revenue. Simply put, defendants are paying for the right to operate and profit from the business they acquired from plaintiffs, and not simply for the use of patents.
The fact that the parties titled their earn-out contract a “license” agreement is not dispositive. (Northeast Gen. Corp. v Wellington Adv., 82 NY2d 158, 163 [1993] [substance of a contract governs, not its “nomenclature”]; see Chemical Bank v Meltzer, 93 NY2d 296, 304 [1999] [“this transaction must be analyzed as an integrated whole. To adopt the approach employed by the lower courts would elevate form over substance, obfuscate the nature of (defendant’s) legal obligations and gloss over the essential character of this transaction”].) No authority cited by the parties stands for the proposition that the Lear doctrine may be invoked to withhold earn-out payments when merely a portion of such payments may be attributed to possibly invalid patents. Nor is there federal authority *212 suggesting that the title of the contract, as opposed to the contract’s substance, should dictate the court’s Lear analysis.
Additionally, while the cited, settled law disfavors no-challenge clauses outside of a post-litigation infringement resolution, defendants cite no authority for the proposition that an agreement requiring continued payment until all patents are declared invalid is unenforceable.[18] Where, as here, the purpose of the earn-out was to function as a proxy for the company’s uncertain future performance, the value (or even the validity) *213 of any individual patent is beside the point.[19] In arguing that Lear is applicable to the ALA, defendants are essentially asking the court to ignore both the economic reality of the ALA and, in that context, the parties’ agreement about how to handle the impact of individual patents, as opposed to all of the licensed patents, being invalidated. Where, as here, these sophisticated parties agreed that only if all of the licensed patents are declared invalid would plaintiffs lose their right to earn-out payments, they clearly anticipated the possibility that some of the licensed patents might be declared invalid and expressly agreed that earn-out payments would continue.
The court finds that the public policy favoring free exploitation of unpatentable products is not implicated here where defendants’ payments are for the purchase of a business that happens to own a patent portfolio. To permit defendants to keep the fruits of the business without actually paying for it by virtue of a cynical invocation of Lear is surely contrary to both state and federal public policy. Accordingly, partial summary judgment on liability is granted to plaintiffs on their first two causes of action.
The court, moreover, does not find it appropriate to stay this action pending adjudication of the Delaware federal actions. It is not convinced that there is a high likelihood that those cases will result in plaintiffs losing this case. A finding by the Delaware Federal Court that even a single claim on the licensed patents is valid will result in a win for plaintiffs in this action. Under section 6.1 of the ALA, defendants’ royalty payment obligations will only cease if and when all of the licensed patents are declared invalid. These sophisticated parties did not—as they could have—contract for the royalty payments to be reduced if certain of the patents were declared invalid.[20] On the contrary, they specifically agreed that full payment of the *214 royalties would be made under the formula set forth in section 3.1 so long as at least one of the licensed patents is not declared invalid. They will be held to that bargain. (See Greenfield v Philles Records, 98 NY2d 562, 569-570 [2002] [“if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity”].)
Turning now to plaintiffs’ fraudulent inducement claim, the court finds it to be well-pleaded. To state a claim for fraud, plaintiffs must allege, with the particularity required by CPLR 3016 (b), “a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages.” (Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 559 [2009]; see Basis Yield Alpha Fund [Master] v Goldman Sachs Group, Inc., 115 AD3d 128. 135 [1st Dept 2014].)
The allegations in the complaint permit a reasonable inference that defendants never intended to pay for the business, but that their scheme was to acquire the business for a small amount up front and then withhold the rest of the royalty payments based on the Lear doctrine. In other words, plaintiffs allege a material misrepresentation of fact made with scienter—defendants’ then-present intention not to pay the bargained-for consideration. Plaintiffs have pleaded reasonable reliance by plausibly alleging that, had they known of defendants’ intentions, they never would have sold the business under the agreed-upon structure. Plaintiffs will be permitted to take discovery on the question of whether defendants always intended to withhold royalty payments based on Lear.[21] If the result of the Delaware actions is that none of the licensed patents are valid, the fraud claim may prove to be a means of recovery. The claim, therefore, is not duplicative,[22] and is ap *215 propriately pleaded in the alternative.[23] The critical questions of whether plaintiffs can prove the elements of scienter, reasonable reliance, and loss causation are, as in most cases, far too fact intensive to resolve on a pre-discovery motion to dismiss. (See ACA Fin. Guar. Corp. v Goldman, Sachs & Co., 25 NY3d 1043, 1045 [2015].) In light of the well pleaded and plausible theory underpinning the fraud claim, dismissal is inappropriate.
With respect to plaintiffs’ request that the court compel defendants to deposit their royalty payments into court pending final adjudication of this action, the court finds such request to be without proper legal foundation. Plaintiffs rely on CPLR 2701 (1), which provides that
“[t]he court . . . may order personal property capable of delivery which is the subject of the action, paid into court, or delivered to such person as it may direct, with such security as the court shall direct, and subject to its further direction if . . .a party has such property in his possession, custody or control as trustee for another party or where it belongs or is due to another party” (emphasis added).
Plaintiffs also rely on the rule that the court’s ability to direct a party to deposit disputed funds under CPLR 2701 (1) is a function of the court’s equitable power and a matter of discre *216 tion, which is incredibly broad. (See Matter of Wien & Malkin v Wichman, 255 AD2d 244, 244 [1st Dept 1998] [“the court possessed ‘inherent plenary power to . . . fashion any remedy necessary for the proper administration of justice’ ”], quoting Cane v Herman, 209 AD2d 368 [1st Dept 1994].) Plaintiffs claim, and defendants do not meaningfully dispute, that defendants have taken steps to make themselves judgment proof.[24]
While this may or may not be true, it is settled law that the court may not order a defendant under CPLR 2701 to pay disputed funds “into court since the court may not direct such payment simply to provide security for satisfaction of a possible judgment.” (Salvatore & Catherine Pepe v Miller & Miller Consulting Actuaries, 221 AD2d 512, 513 [2d Dept 1995]; see Rosenblat v Seidman, 243 AD2d 699 [2d Dept 1997]; see also Arbeeny v Kennedy Exec. Search, Inc., 31 Misc 3d 494, 503 [Sup Ct, NY County 2011, Bransten, J.] [same], citing Renad, Inc. v Grana, Ltd., 127 AD2d 994 [4th Dept 1987].)
Finally, plaintiffs seek an accounting under section 3.4 of the ALA, which entitles Island to
“the right, no more than once in any given twelve (12) month period, during regular business hours and on reasonable notice of at least ten (10) Business Days to [Reich & Tang], to examine, through a third party accounting firm reasonably acceptable to [Reich & Tang], [Reich & Tang’s] books of account and records relating to [Reich & Tang’s] performance of its obligations under this Agreement.” (See Doc No. 14 at 12.)
Defendants do not meaningfully oppose this request; their opposition is merely based on their misplaced reliance on rules applicable to an equitable accounting, which requires the existence of a fiduciary relationship (not present here). {See Castellotti v Free, 138 AD3d 198, 210 [1st Dept 2016].) Defendants do not address plaintiffs’ contractual accounting rights under section 3.4. Plaintiffs’ request for an accounting, therefore, is granted.
Accordingly, it is ordered that defendants’ motion to dismiss the complaint is denied, defendants’ motion to stay this action is denied, plaintiffs’ cross motion for partial summary judgment on liability is granted, plaintiffs’ motion to compel defendants to deposit royalties under CPLR 2701 is denied, and *217 plaintiffs’ motion to compel defendants to provide an accounting under section 3.4 of the ALA is granted; and it is further ordered that within 30 days of the entry of this order on NYSCEF, defendants must provide plaintiffs with accounting access in accordance with section 3.4 of the ALA so long as plaintiffs provide the requisite 10 days’ notice.

. See Doc No. 52 (“Plaintiffs have withdrawn, without prejudice and reserving all rights, those portions of their Cross-Motion for Partial Summary Judgment. . . and their Complaint. . . that seek [1] specific performance [as opposed to monetary damages] of their claims [except as to specific performance of Defendants’ obligation to provide royalty calculations under Section 3.2 of the Amended and Restated License Agreement], and [2] to compel Defendants to deposit royalty payments with the Court pursuant to CPLR 2701[1]. Plaintiffs’ [withdrawal of] their CPLR 2701[1] request is based on Defendants’ agreement to deposit monies into escrow pending resolution of the parties’ dispute concerning the royalties owed under the Amended and Restated License Agreement”). References to “Doc No.” fol *197 lowed by a number refer to documents filed in this action on the New York State Courts Electronic Filing system (NYSCEF). As discussed herein, after the parties’ dispositive motions were fully submitted, defendants refused to continue depositing royalty payments into court, which resulted in plaintiffs moving for relief under CPLR 2701 (1).

. To date, it does not appear that any of the patents have been declared invalid.

. Lear abrogated the patent licensee estoppel doctrine, which was that a patent licensee effectively recognizes the validity of the patent and is estopped from challenging it. Lear held that a contract clause estopping a patent licensee from challenging the patent’s validity is against federal policy *198 and that a patent licensee who establishes the invalidity of a patent can avoid paying royalties accrued after the patent’s issuance. Lear employed a balancing test and found that the public policy against the withdrawal of nonpatentable products from the public domain outweighs the common law of contracts. (But see Flex-Foot, Inc. v CRP, Inc., 238 F3d 1362 [Fed Cir 2001] [public policy in favor of settlement agreements outweighs public interest in patents].) As explained in Kimble v Marvel Entertainment, LLC (576 US —, —, 135 S Ct 2401, 2407 [2015]):
“we have deemed unenforceable private contract provisions limiting free use of [unpatentable] inventions. In Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249 . . . (1945), for example, we determined that a manufacturer could not agree to refrain from challenging a patent’s validity. Allowing even a single company to restrict its use of an expired or invalid patent, we explained, ‘would deprive . . . the consuming public of the advantage to be derived’ from free exploitation of the discovery. Id., at 256 . . . And to permit such a result, whether or not authorized ‘by express contract,’ would impermissibly undermine the patent laws. Id., at 255-256 . . . ; see also, e.g., Edward Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U.S. 394, 400-401 . . . (1947) (ruling that Scott Paper applies to licensees); Lear, Inc. v Adkins, 395 U.S. 653, 668-675 . . . (refusing to enforce a contract requiring a licensee to pay royalties while contesting a patent’s validity).”

. Defendant Michael Lydon, who is not a party to either of the contracts at issue, is the president and chief executive officer of RTAM and RTDS. He is sued in his individual capacity on the fraud claim because he made the allegedly material misrepresentations giving rise to the claim.

. As memorialized in the ALA’s second whereas clause, the original license agreement was entered into on or about October 8, 2009. (See Doc No. 14 at 2.)

. The number of licensed patents has apparently increased to more than 60 with nearly 1,400 claims. (See Doc No. 96 at 1.) While the exact number is not material to this decision, it should be noted that 58 patents containing 1,332 claims appear to be at issue in the Delaware cases. (See Doc No. 141 at 2.)

. Other amounts, such as the adjustment addressed in section 2.5, are not at issue and are not alleged to have materially changed the purchase price. Also irrelevant are the termination provisions in article VIII, as *202 plaintiffs do not seek to exercise their option to terminate the APA or ALA. (See Doc No. 13 at 46.) On the contrary, plaintiffs merely seek to enforce these contracts. Defendants’ arguments regarding plaintiffs’ supposed failure to comply with article VUI’s preconditions to termination are inapposite.

. Sections 3.3 and 3.4 grant Island books and records access and audit rights to ensure that it is paid the proper amount. (See Doc No. 14 at 11-12.) Section 3.4 governs the accounting that plaintiffs seek on the instant motions.

. “Earn-out provisions in merger-and-acquisition agreements are intended to accommodate the seller’s desire for compensation for the anticipated future value of the transferred assets and the buyer’s reciprocal desire to avoid overpaying for potential, but as yet unrealized, value.” (Highland Capital Mgt. LP v Schneider, 8 NY3d 406, 408 n 1 [2007]; see e.g. Demetre v HMS Holdings Corp., 127 AD3d 493, 493 [1st Dept 2015] [“Pursuant to a stock purchase agreement (SPA), HMS acquired all of the shares in AMG. Under the SPA, the purchase price for AMG consisted of a single ‘upfront’ cash payment of $13 million at closing, plus two subsequent annual ‘earn-out’ or ‘contingent’ payments. The earn-out or contingent payments were based on the financial performance of AMG”].)

. It should be noted that, as with the APA, the ALA has not been terminated under section 6.2. (See Doc No. 14 at 14-15.)

. As noted, the specific performance claim in this cause of action and in the second cause of action were withdrawn.

. The complaint filed on June 23, 2015 is redacted. An unredacted version, which is the version cited to by the court, was filed on June 26, 2015. (See Doc No. 8.)

. “In September 2015, Plaintiffs moved pursuant to CPLR 2701(1) to have the royalty payments deposited into Court. In response, Defendants agreed to remit quarterly payments into escrow. Based thereon, Plaintiffs withdrew their CPLR 2701(1) motion, without prejudice to its reinstatement should payments cease.” (Doc No. 105 at 3 [citation omitted].) Plaintiffs filed the current motion under CPLR 2701 (1) two weeks after defendants stopped escrowing royalty payments, which plaintiffs claim was done “in retaliation for Plaintiffs having truthfully advised Chambers that the mediation/ settlement talks” had failed. (Id.)

. While plaintiffs oppose a stay of this action, they do not dispute that federal court is the proper forum to litigate the licensed patents’ validity. (See Levi Strauss & Co. v Aqua Dynamics Sys., Inc., 2016 WL 1365946, *5, 2016 US Dist LEXIS 46738, *13 [ND Cal, Apr. 6, 2016, No. 15-cv-04718-WHO] [“courts have repeatedly held that a state-law-based breach of contract claim arises under federal law where it depends on a finding that the defendant has infringed the plaintiff’s patents”] [collecting cases].) Hence, the validity of the licensed patents is an issue for the Delaware Federal Court, while the implications of any findings of invalidly on the contracts are for this court to decide. As noted, the Delaware court has stayed the proceedings before it.

. The Federal Circuit is the primary Federal Circuit Court of Appeals that develops patent law. (See 28 USC §§ 1292 [c] [2]; 1295 [a] [4].)

. It should be noted that RCA’s holding with respect to an entirely unrelated issue—“on-sale bar”—was subsequently abrogated. (See Linear Tech. Corp. v Micrel, Inc., 275 F3d 1040, 1048 [Fed Cir 2001].)

. This court need not actually rule on whether the no-challenge clause in section 6.4 of the ALA is enforceable because plaintiffs have not sought to enjoin defendants from proceeding with the Delaware actions.

. It appears that the question of the extent to which Lear and related federal law preempt state contract law is somewhat unsettled. (See e.g. Veranee Corp. v Digimarc Corp. [Delaware], 2011 WL 2182119, *6-7, 2011 US Dist LEXIS 58788, *19-20 [D Del, June 2, 2011, Civil Action No. 10-831] [“Under these circumstances, state contract law controls the enforceability of the License Agreement, not federal patent law . . . (because) federal patent law does not preclude a royalty agreement for a patent which never issues, so long as the parties contemplated non-issuance”; “the court affirmed an award of royalty payments under a licensing agreement for the period preceding the licensee’s complaint challenging the patent’s validity . . . (and the Third Circuit did not hold) that (the) license agreement is void as a matter of law if a court subsequently determines the patent is invalid”]; see also Jang v Boston Scientific Corp., 767 F3d 1334, 1336 [Fed Cir 2014] [denying interlocutory review where “the district court found that under this court’s decision in Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co., 112 F3d 1561 (Fed Cir 1997) . . . , a patentee is not precluded under Lear from recovering royalties until the date the licensee or assignee first challenges the validity of the patent. Because the court concluded that Jang could seek royalties prior to a challenge to the validity of the patents, it denied the motion for summary judgment”].) It is worth noting that the Federal Circuit’s decision in Studi-engesellschaft has been cited positively by the United States Supreme Court. (See MedImmune, Inc. v Genentech, Inc., 549 US 118, 124 [2007] [“petitioner assuredly did contend that it had no obligation under the license to pay royalties on an invalid patent. Nor is that contention frivolous. True, the license requires petitioner to pay royalties until a patent claim has been held invalid by a competent body, and the Cabilly II patent has not. But the license at issue in Lear . . . similarly provided that ‘royalties are to be paid until such time as the “patent ... is held invalid,” ’ and we rejected the argument that a repudiating licensee must comply with its contract and pay royalties until its claim is vindicated in court. We express no opinion on whether a nonrepudiating licensee is similarly relieved of its contract obligation during a successful challenge to a patent’s validity—that is, on the applicability of licensee estoppel under these circumstances” (citation omitted; emphasis added)].) In fact, while the Lear doctrine is grounded on public policy concerns, the United States Supreme Court recently held that competing public policy interests may take precedence over certain patent law rules. (See Medtronic, Inc. v Mirowski Family Ventures, LLC, 571 US —, —, 134 S Ct 843, 852 [2014] [addressing anticompetitive concerns].) This court sees no reason why the public policy favoring freedom of contract among sophisticated parties (see J.P. Morgan Sec. Inc. v Vigilant Ins. Co., 21 NY3d 324, 334 [2013]) cannot be considered when the parties’ agreement does not offend the principal concerns of Lear.

. There is nothing in the record indicating that the revenue the business generates is affected by the validity of the licensed patents. This makes sense because demand for the business’ services is not necessarily impacted by the academic question of whether the business employs patentable methods in providing such services. A customer may choose to use the business’ services due to the quality provided at the price offered—a calculus that does not inherently turn on whether the methods used by the company are patented or patentable.

. Defendants have not cited any federal authority that would require a pro rata royalty payment reduction, nor does Lear or its progeny provide any support for that notion. It is likely extremely difficult to parse out the value of each patent from the value of the company’s gross income. There is no need to do so in this case given the parties’ all-or-nothing bargain.

. While Alice was not decided by the Supreme Court until after the sale (lower court decisions had been issued and the case was before the Federal Circuit), the parties were indisputably aware of the questionable foundation upon which the validity of many business method patents are based. Simply put, the Supreme Court’s holding in Alice (which did not actually invalidate the patents at issue) was quite foreseeable.

. The fraud claim is not duplicative since the intent not to perform is considered a separately actionable collateral misrepresentation under First Department precedent. (See Laduzinski v Alvarez & Marsal Taxand LLC, 132 AD3d 164, 169 [1st Dept 2015]; Wyle Inc. v ITT Corp., 130 AD3d 438, 438-442 [1st Dept 2015]; accord Sabo v Delman, 3 NY2d 155, 160 [1957] [“it is settled that, if a promise was actually made with a preconceived and un *215 disclosed intention of not performing it, it constitutes a misrepresentation of ‘a material existing fact’ upon which an action for rescission may be predicated”].) The fraud claim, moreover, is not duplicative as against Lydon because he is not a party to the contracts. (See Allenby, LLC v Credit Suisse, AG, 134 AD3d 577, 581 [1st Dept 2015].)

. The fraud claim may prove moot depending on the outcome of the contract claim, but it is premature to dismiss the claim at this juncture. The claim, however, may have to be withdrawn because, once an election of remedies is required (see Unisys Corp. v Hercules Inc., 224 AD2d 365, 367 [1st Dept 1996] [“where a plaintiff may seek recovery on alternative theories, he must make an election of remedies at trial or . . . summary judgment” (citations omitted)]), plaintiffs may not simultaneously seek enforcement of the subject contracts while also seeking to rescind them on the ground of fraudulent inducement. (See VisionChina Media Inc. v Shareholder Representative Servs., LLC, 109 AD3d 49, 56-57 [1st Dept 2013], citing Clearview Concrete Prods. Corp. v S. Charles Gherardi, Inc., 88 AD2d 461, 466 [2d Dept 1982]; see also Bernstein v Cooke, 103 AD2d 725, 728 [1st Dept 1984] [“One elects either to continue with the contract fraudulently induced or to rescind it. If one elects to continue with it, one accepts all the burdens contained in the contract as well as the benefits”].) At this juncture, where damages have yet to be determined and the pendency of the Delaware actions could undermine plaintiffs’ contract claims, plaintiffs need not make an election of remedies.

. Plaintiffs, it should be noted, have not moved for an attachment. (See CPLR 6201.)